Gene CASHMAN and Athena Sutsos, Plaintiffs–Appellants,

v.

CITY OF COTATI, a municipal corporation, Defendant–Appellee.

No. 03–15066.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 11, 2004.

Filed July 15, 2004.

R.S. Radford, Meriem L. Hubbard, and Harold E. Johnson, Pacific Legal Foundation, Sacramento, CA, for the appellants.

Donald R. Lincoln and Henry E. Heater, Endeman, Lincoln, Turek & Heater LLP, San Diego, CA, and Jeffrey A. Walter, Walter & Pistole, Sonoma, CA, for the appellee.

Before ALARCÓN, BEEZER, and W. FLETCHER, Circuit Judges.

BEEZER, Circuit Judge.

Appellants Gene Cashman and Athena Sutsos, both mobilehome park owners, allege that the rent control ordinance adopted by appellee City of Cotati, California ("the City") effects a regulatory taking in violation of the Fifth and Fourteenth Amendments to the United States Constitution. After granting their motion for summary judgment and entering judgment, the district court amended then vacated that judgment pursuant to Federal Rules of Civil Procedure 59(e) and 60(b), respectively. The district court conducted a trial and entered judgment for the City. Cashman and Sutsos appeal the district court's orders amending and vacating the original judgment, as well as its findings and conclusions following trial.

We vacate the post-trial judgment and remand to the district court for reinstatement of the original judgment in favor of Cashman and Sutsos.

## I

On September 23, 1998, the City adopted Ordinance No. 680, entitled the Mobilehome Park Space Rent Stabilization Program ("Ordinance No. 680" or "the Ordinance"). The City adopted Ordinance No. 680 in anticipation of the repeal of its then-governing rent control ordinance, Chapter 19.12, adopted in 1979 ("the 1979 Ordinance").[1] The operative provisions of Ordinance No. 680 limit the annual rental increases mobilehome park owners can charge to the lesser of 6% or the percentage change in the Consumer Price Index (CPI). Proposed increases exceeding this amount are subject to administrative review. Unlike the 1979 Ordinance, Ordinance No. 680 contains an explicit provision regarding vacancy control.[2] Vacancy control prevents mobilehome park owners from charging a new base rent or increasing the existing rent for a mobilehome space when ownership of a mobilehome coach is transferred and the coach remains in place.

The stated purpose of Ordinance No. 680 is to "stabilize the rate of mobilehome park rental rates." According to the Ordinance, the stabilization of rental rates will accomplish the following:

(1) prevent exploitation of the shortage of vacant mobilehome park spaces;

(2) prevent excessive and unreasonable mobilehome park space rent increases;

(3) rectify the disparity of bargaining power which exists between mobilehome park residents and mobilehome park owners;

(4) provide mobilehome park owners with a guaranteed rate of annual space rent increase which accurately reflects the rate of inflation and increases in their expenses; and

(5) provide a process for ensuring mobilehome park owners a fair, just and reasonable rate of return on their parks in cases where the guaranteed annual space rent increase provided by this chapter proves insufficient;

---

**1.** The 1979 Ordinance covered all types of rental properties. Pursuant to a settlement agreement in an unrelated case, the City was required to place the question of repealing the 1979 Ordinance on the ballot for November 1998. The voters approved the repeal; Ordinance No. 680 took effect on December 19, 1998.

**2.** Section 19.14.150 of the Ordinance, titled "VACANCY CONTROL AND DE–CONTROL—ESTABLISHMENT OF NEW BASE RENT," provides, in part, that:

  (a) Except as otherwise provided in this Sec. 19.14.150, a mobile home park owner shall not charge a new base rent or increase the rent for a mobile home space because that space has become vacant or the tenancy with respect to that space has terminated. A mobilehome park owner shall be permitted to charge a new base rent for a mobile-home space whenever a lawful space vacancy occurs. For the purposes of this chapter, a lawful space vacancy is defined as follows:

  (1) A vacancy of the mobilehome space occurring because of the termination of the tenancy of the affected mobilehome tenant in accordance with the Mobilehome Residency Law . . . ;

  (2) A vacancy of the mobilehome space arising from the voluntary removal of a mobilehome from the mobile home space by the affected mobilehome tenant. . . .

  . . .

  (c) In the absence of a lawful vacancy of the mobilehome space, a park owner is prohibited from raising rent upon a sale of a mobilehome on site to a tenant-to-be or a current tenant.

(6) provide continued rent control through the transfer of a mobile-home-on-site (i.e., on the mobilehome pad) to a new mobilehome owner to prevent exploitative rental increases which take place when vacancy decontrol is either in effect or practised by park owners.

(7) provide options in the duration of tenancies to prospective mobilehome tenants to prevent oppressive adhesion contracts from being imposed upon new park tenants.

The district court concluded that Ordinance No. 680 has the additional purpose of providing and maintaining affordable housing to lower income and elderly residents.

Ordinance No. 680 also contains several legislative findings of fact in support of its adoption. These findings describe the mobilehome market in Cotati, including the 0% vacancy rate among mobilehome park spaces; the older and lower income demographic common among mobilehome owners; the high costs associated with relocating a mobilehome; and the success of the 1979 rent stabilization ordinance. There is also a finding that "[s]ince the adoption of the 1979 rent stabilization ordinance, the City has construed its provisions as requiring vacancy control: that is, upon the tenant's vacating of a rental unit or space, his/her successor tenant is entitled to the same rent previously charged to the vacating tenant."

Cashman and Sutsos own mobilehome parks in Cotati that are subject to Ordinance No. 680. They bring the instant action alleging, *inter alia,* that Ordinance No. 680 constitutes a facially unconstitutional regulatory taking because it does not substantially advance the City's interests as they are described in the Ordinance. Specifically, Cashman and Sutsos claim that Ordinance No. 680 permits a tenant to capture a premium upon the sale of his/her mobilehome coach that corresponds to the increased value of the coach attributable to rent control. This premium, they argue, keeps the costs for incoming tenants the same and, therefore, prevents the Ordinance from substantially advancing the City's interests, including increasing affordable housing. They seek injunctive and declaratory relief.[3]

The district court initially granted Cashman's and Sutsos's motion for summary judgment. Relying largely on our decision in *Richardson v. City and County of Honolulu,* 124 F.3d 1150 (9th Cir.1997), the court declares "the Ordinance to be an unconstitutional regulatory taking in violation of the Takings Clause of the Fifth Amendment," and enters judgment. The district court subsequently grants the City's motion to amend the judgment pursuant to Rule 59(c), holding that only the Ordinance's vacancy control provision is unconstitutional, not the entire Ordinance.

The City appealed the grant of summary judgment; Cashman and Sutsos cross-appealed regarding the district court's decision to amend the judgment.

While these appeals were pending we filed an opinion in *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030 (9th Cir.2000) (*"Chevron I"*). In response to the City's Rule 60(b) motion, the district court requested that we remand the case so that it could consider whether its earlier interpretation of *Richardson* was erroneous in light of *Chevron I* and whether to grant

---

**3.** The district court granted the City's motion to dismiss Cashman's and Sutsos's additional claims for damages.

relief from the amended judgment.[4] We remanded the case to the district court, which, in turn, vacated its amended judgment and proceeded to trial. Cashman and Sutsos appealed. We dismissed their appeal. We also dismissed the other pending appeals as moot.

The district court conducted a five-day bench trial[5] in the course of which it heard testimony from both parties's expert witnesses. The trial court concludes that Cashman and Sutsos failed to show that Ordinance No. 680 creates or is likely to create a premium in connection with the resale of mobilehome coaches and that even if a premium did exist, Cashman and Sutsos did not establish that it would interfere with the stated purposes of the Ordinance.

## II

In its findings of fact and conclusions of law following trial, the district court concludes that Cashman's and Sutsos's claims are barred by the statute of limitations. The district court says that because Ordinance No. 680 has the "same effect and operative provisions" as the 1979 Ordinance, Cashman and Sutsos were on notice of the alleged regulatory taking under the 1979 Ordinance; therefore, the statute for their facial challenge began to run with the passage of the 1979 Ordinance. *Id.*

■ We review *de novo* the question whether a claim is barred by the statute of limitations. *Immigration Assistance Project of Los Angeles County Federation of Labor (AFL–CIO) v. INS*, 306 F.3d 842, 856 (9th Cir.2002). We also review *de novo* the question when the statute of limitations begins to run. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 780 (9th Cir.2002).

■ Cashman and Sutsos properly bring their regulatory takings claim under § 1983. *Hacienda Valley Mobile Estates v. City of Morgan*, 353 F.3d 651, 655 (9th Cir.2003). For § 1983 actions accruing after 1985, the applicable statute of limitations is one year. *Id.* (citing *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 688 (9th Cir.1993)). Facial regulatory takings claims accrue on either: (1) the date compensation is denied in state courts; or (2) the date the ordinance is passed, if resort to state courts is futile. *Id.* The first date is not relevant here because Cashman and Sutsos did not seek compensation from the state.[6]

4. The City filed its notice of appeal prior to its Rule 60(b) motion because we had not yet issued our opinion in *Chevron I*. To make a Rule 60(b) motion after a notice of appeal has been filed, "the proper procedure is to ask the district court to indicate whether it wishes to entertain the motion, or to grant it, and then move, if appropriate for remand of the case." *Long v. Bureau of Econ. Analysis*, 646 F.2d 1310, 1318 (9th Cir.1981), *rev'd on other grounds*, 454 U.S. 934, 102 S.Ct. 468, 70 L.Ed.2d 242 (1981).

5. Prior to trial, Judge William H. Orrick recused himself; Judge Saundra Brown Armstrong presided.

6. Ordinarily, where a state provides adequate procedure for seeking just compensation, a facial regulatory takings claim under the Fifth Amendment will not be deemed ripe until the property owner has followed the procedure and been denied just compensation. *Hacienda Valley*, 353 F.3d at 655; *Richardson*, 124 F.3d at 1165 (citing *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)).

However, we hold that the denial of compensation is irrelevant for ripeness purposes where a takings claim is based on the theory that the ordinance does not substantially advance a legitimate state interest. *Richardson*, 124 F.3d at 1165; *see also Yee v. City of Escondido*, 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) ("As this [premium argument] does not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property or

■ The district court cites *De Anza Properties X, Ltd. v. County of Santa Cruz*, 936 F.2d 1084, 1086 (9th Cir.1991), for the proposition that where a challenged rent control ordinance contains the same provisions as a previous ordinance, the statute of limitations will run from the date the previous ordinance was enacted, so long as the conduct of the government in relation to both ordinances and the effect on the plaintiff has not changed. Applying this proposition to the instant case, the district court concludes that the statute of limitations began to run when the 1979 Ordinance was enacted. The 1979 Ordinance "contained rent and vacancy control provisions equivalent to those provided in Ordinance No. 680" and the "[p]laintiffs' expert ... testified that the effect of the 1979 Ordinance was the same as the effect of Ordinance No. 680."

*De Anza* is factually inapposite with this case. In *De Anza*, the plaintiffs challenge a rent control ordinance enacted in 1982, five years before they file suit. 936 F.2d at 1085. They argue that their claim accrues in 1987 when the county amends the ordinance to remove a sunset provision. *Id.* at 1086. We reject plaintiffs's argument, noting that "the provision of the ordinance which [plaintiffs] challenge has remained exactly the same since 1982." *Id.*

Unlike the amended ordinance in *De Anza*, Ordinance No. 680 is a separate, new enactment. For example, the 1979 Ordinance applied to all types of rental properties while Ordinance No. 680 applies only to mobilehomes. The terms of Ordinance No. 680 differ substantively from the City's 1979 rent control ordinance, as well. The 1979 Ordinance established a temporary freeze and rent rollback after which maximum base rents are established annually by a rent appeals board. Ordinance No. 680, by contrast, provides specific limits on yearly rental increases—namely, the lesser of 6% or the increase in the CPI. Moreover, unlike the 1979 Ordinance, Ordinance No. 680 contains an express vacancy provision. Despite the district court's finding that the 1979 Ordinance had "the effect" of vacancy control because Cotati interpreted and enforced the ordinance as though it contained such a provision, nothing in the legislative purpose of the 1979 Ordinance or its provisions indicate that the City sought specifically to provide for vacancy control. Whatever the particular application of the earlier ordinance, it does not change the fact that Ordinance No. 680 is a provisionally-distinct enactment.[7]

Finally, the district court's reliance on the testimony of Cashman's and Sutsos's expert, Dr. Michael St. John, is misplaced. The district court quotes from Dr. St. John's testimony that "the effect of the 1979 Ordinance was the same as the effect of Ordinance No. 680 and that Ordinance No. 680 'piggy backs' on the 1979 Ordinance." However, as the following colloquy indicates, taken in context it is clear that Dr. St. John testifies only on the similar tendency of the two ordinances to increase the bargaining power of mobilehome coach owners vis-à-vis park owners:

the extent to which these particular petitioners are compensated, petitioners's facial challenge is ripe."); *San Remo Hotel v. City and County of San Francisco*, 145 F.3d 1095, 1102 (9th Cir.1998) (stating that a facial takings claim based on a substantially advanced theory is ripe the instant the challenged ordinance is passed).

7. Even assuming the 1979 Ordinance contained an implied vacancy control provision, the earliest Cashman and Sutsos were on notice of it was August, 8, 1998, when the City argued the point for the first time in support of a tenant's complaint in an unrelated case. Cashman and Sutsos filed this action on July 28, 1999, less than one year later.

Q: WELL, ASSUMING THE CITY ENACTED [Ordinance No. 680] TO RECTIFY THE DISPARITY BARGAINING POSITION THEY FELT EXISTED ..., YOU WOULD AGREE THAT THE ORDINANCE HAS ACHIEVED THAT PURPOSE?

A: THIS ORDINANCE PIGGY BACKS ON THE OLD ORDINANCE. THIS ORDINANCE DOESN'T DO THAT. IT'S ALREADY BEEN THAT WAY. IT'S BEEN THAT WAY SINCE '79.

Q: ALL RIGHT. THE ORIGINAL ORDINANCE DID THAT?

A: THE ORIGINAL ORDINANCE INCREASED THE BARGAINING POWER OF THE RESIDENTS...."

Dr. St. John expresses no opinion as to the operative provisions of the two ordinances, including vacancy control, or the manner in which they regulate rents.

We reverse the district court's judgment that the statute of limitations bars Cashman's and Sutsos's claim.

## III

**A. We have appellate jurisdiction over the district court's orders vacating and amending the original judgment**

The district court granted the City's motion to amend the judgment pursuant to Rule 59(e), finding only the vacancy control provision of Ordinance No. 680 unconstitutional. On remand, the district court granted the City's motion pursuant to Rule 60(b), vacating the amended judgment and setting the case for trial. The City argues that both orders are interlocutory and nonappealable.

We hold that interlocutory orders that are otherwise nonappealable become merged into the final judgment. *American Ironworks & Erectors, Inc. v. North Am. Constr. Corp.*, 248 F.3d 892, 897 (9th Cir.2001). "[A]n appeal from the final judgment draws in question all earlier non-final orders and all rulings which produced the judgment." *Munoz v. Small Bus. Admin.*, 644 F.2d 1361, 1364 (9th Cir.1981). The district court's orders vacating and amending the judgment became appealable when it entered final judgment.[8] We have jurisdiction to review whether the district court erred in reopening the first judgment. *Hamilton–Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 258–59, 36 S.Ct. 269, 60 L.Ed. 629 (1916); *see also Edwin Raphael Co. v. Maharam Fabrics Corp.*, 283 F.2d 310, 310 (7th Cir. 1960) ("[A]n order vacating a default judgment is interlocutory in character. However, it may be reviewed in an appeal from a final judgment in the same case, since it is merged in the final judgment."); 11 James Wm. Moore, et al., Moore's Federal Practice ¶ 60.30 (2d ed.1995).

**B. The district court abused its discretion in amending the judgment**

As noted, the district court amended the judgment to find unconstitutional only the vacancy control provisions of Ordinance No. 680. In so doing, the district court finds that the "specific allegations of the complaint ... focus on the vacancy control portion of the Ordinance" and "the

---

8. Although the City attempts to characterize the district court's order vacating the judgment as a denial of summary judgment, an order granting a motion under Rule 60(b) is distinct from the denial of summary judgment. *Ballard v. Baldridge*, 209 F.3d 1160, 1161 (9th Cir.2000). Indeed, "[w]hen an order granting a Rule 60(b) motion[ ] merely vacates the judgment and leaves the case pending for further determination[,] the order is akin to an order granting a new trial." *Id.* (quoting *Parks v. Collins*, 761 F.2d 1101, 1103–04 (5th Cir.1985)) (internal quotations omitted).

possibility that tenants could sell their mobilehomes at a premium." The court then concludes that invalidating the vacancy control provision would eliminate the Ordinance's constitutional infirmities: "[A] premium could exist only because the vacancy control provision of the Ordinance prevents the mobilehome park owners from raising rents when a tenant sells his or her mobilehome to a new owner without moving it to a new location." Cashman and Sutsos argue that their complaint is not so limited; they also dispute the court's finding regarding vacancy control and premiums, claiming that the district court ignores the possibility that a new tenant would pay a premium to live in a mobilehome park where future rent increases are controlled, even if that new tenant initially is required to pay a rent higher than did the incumbent tenant.

■ We review the district court's decision on the City's Rule 59(e) motion to amend the judgment for abuse of discretion.[9] *Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir.2001). An erroneous view of the facts or the law constitutes an abuse of discretion. *K.V. Mart Co. v. United Food and Commercial Workers Int'l Union, Local 324*, 173 F.3d 1221, 1223 (9th Cir.1999).

The complaint's first cause of action for declaratory relief states that "[p]laintiffs desire a judicial determination that Ordinance No. 680 effects an unconstitutional taking, and is thus void, unenforceable, and invalid." Cashman and Sutsos allege, *inter alia*, that:

27. Mobilehome coaches protected by [the Ordinance] and the Residency Law realize a substantial increase in price relative to comparable coaches located in parks not subject to [the Ordinance]. The increase represents the value of the right to occupy a space indefinitely at below-market rents.

28. When a resident of one of Plaintiffs' mobilehome parks sells his or her mobilehome coach, a premium is received from the purchaser corresponding to the coach's increased value attributable to the effect of [the Ordinance].

The complaint's allegations regarding the constitutionality of Ordinance No. 680 do not hinge on the existence of vacancy control or any other particular provision. It is true that absent vacancy control a mobilehome park owner can increase the amount of rent charged to a new tenant. However, consistent with Cashman's and Sutsos's allegations, an incumbent tenant selling his/her mobilehome can nonetheless extract a premium above and beyond any such rental increase based on the security of living in a mobilehome park where *future* rental increases are limited by the government.[10]

9. This court has not addressed the appropriate standard of review for a district court's decision granting a Rule 59(e) motion to amend, which is based, at least in part, on a question of law. Our sister circuits hold that such a motion is reviewed *de novo*, not for an abuse of discretion. *See, e.g., Pioneer Natural Resources USA, Inc. v. Paper, Allied*, 328 F.3d 818, 820 (5th Cir.2003); *Hansmann v. Fidelity Inv. Inst. Serv.*, 326 F.3d 760, 766–67 (6th Cir.2003); *Perez v. Volvo Car Corp.*, 247 F.3d 303, 318–319 (1st Cir.2001). We need not resolve this question because we hold that the district court's decision that the vacancy control provision is severable from the remainder

of Ordinance No. 680 is erroneous under either standard.

10. The City responds that a mobilehome park owner can just as easily raise the rent upon the sale of a mobilehome to a higher than market level, permitting him to extract this premium based on the lack of future rent increases. Red Br. 29. The City overlooks a crucial aspect of rent control in the mobilehome park context—*i.e.*, separate ownership of the land and the mobilehome, with the tenant having the ability to convey ownership of the mobilehome. These circumstances make it possible for *both* the tenant and park

■ We conclude that the district court's order amending the judgment is based on an erroneous view of the complaint and constitutes an abuse of discretion.

## C. The district court misapplied Chevron I when it vacated the amended judgment on remand

Cashman and Sutsos maintain that the district court erred in vacating the amended judgment pursuant to Rule 60(b).

■ We review the district court's decision to vacate the judgment pursuant to Rule 60(b) *de novo*. *See Fireman's Fund Inc. Co. v. Stites*, 258 F.3d 1016, 1020 (9th Cir.2001). Although we usually review a district court's decision pursuant to Rule 60(b) for abuse of discretion, *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1254 (9th Cir.2004), we apply our *de novo* standard in cases where, as here, "the district judge considered afresh his earlier decision to grant summary judgment." *Fireman's Fund Inc. Co.*, 258 F.3d at 1020 (*citing Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir.1999) (*en banc*)).[11]

■ A rent control ordinance effects an unconstitutional taking if it fails to substantially advance a legitimate state interest. *Agins v. City of Tiburon*, 447 U.S. 255, 261, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Chevron v. Lingle*, 363 F.3d 846, 2004 WL 720175 (9th Cir. April 1, 2004) ("*Chevron II* "). Unlike ordinary rent control ordinances, an ordinance that permits incumbent tenants to capture a premium based on the present value of the

reduced rent fails to substantially advance a state's interest in creating or maintaining affordable housing. *Chevron II*, 2004 WL 720175, at * 7; *Richardson*, 124 F.3d at 1166; *cf. Chevron I*, 224 F.3d at 1040 ("[T]he absence of a mechanism that prevents a premium transfer [does not] *necessarily* destroy[ ] the constitutionally-required connection" where other factors may make a premium unavailable) (emphasis added); *see also Yee v. City of Escondido*, 503 U.S. 519, 530, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (the existence of a premium "might have some bearing on whether the ordinance causes a regulatory taking, as it may shed some light on whether there is a sufficient nexus between the effect of the ordinance and the objectives it is supposed to advance").

In its original opinion granting summary judgment for Cashman and Sutsos, the district court relies on *Richardson v. City & County of Honolulu* to hold that Ordinance No. 680 is unconstitutional, as a matter of law, because"[n]othing in the language of the Ordinance prevents a mobilehome owner from capitalizing on his below-market rents by selling his mobilehome for a premium." This, the court states, prevents Ordinance No. 680 from substantially furthering the City's interest in maintaining affordable rent, lessening inequality of bargaining power and permitting landlords a reasonable rate of return.

The district court subsequently granted the City's motion for a memorandum opinion stating the court's inclination to grant relief from the amended judgment in light

---

owner to capture part of the premium. The tenant will capture part of the premium through an increased mobilehome sale price; the park owner through increased land rent. Cashman's and Sutsos's complaint claims that the ability of the tenant to capitalize *any* of the value of the reduced rent effects a regulatory taking.

**11.** In this case, little turns on the standard of review we apply. The district court's Rule 60(b) analysis turned on legal questions and, by definition, an erroneous view of the law is an abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

of our opinion in *Chevron I*. According to the court, *Chevron I* makes clear that Cashman and Sutsos failed to meet their burden for summary judgment because they "did not present any evidence as to the likelihood that [Ordinance No. 680] would create a sales premium that could be captured by the mobilehome park tenants," as a matter of fact, or that "any such sales premium would interfere with the purposes of the Ordinance."

The district court's original opinion correctly applies the law; the court misinterprets our opinion in *Chevron I*.

1. *A rent control ordinance that does not on its face provide for a mechanism to prevent the capture of a premium is unconstitutional, as a matter of law, absent sufficient evidence of externalities rendering a premium unavailable*

◼ In *Richardson v. City and County of Honolulu*, land owners facially challenge Hawaii's rent control ordinance that limits increases in ground rent due to the owners of the land under condominium units. 802 F.Supp. 326, 329–30 (D.Haw.1992). The legislature passed the ordinance to combat excessive increases in lease rates, inequity of bargaining power, and the deleterious effect of increasing lease rentals on existing tenants. *Id.* at 329. Like mobilehome parks, condominiums ordinarily involve dual ownership—that is, the land underneath the condominium is owned by someone other than the condominium owner. *Id.* at 339. The rent control ordinance in *Richardson* allows owner-occupants to sell their condominiums subject to the controlled ground rents so long as the new tenant also intends to be an owner-occupant. *Id.* at 330. The landowners argue that the ordinance does not substantially further Hawaii's interests because it allows owner-occupants to capture a premium on the sale of their condominium, thereby failing to reduce the costs to new owners. *Id.*

at 338. The district court agrees. Faced with no conflicting expert evidence, the court relies on the "principles relating to premiums," concluding that where, as in the context of condominiums, there is separate ownership of the land and housing unit involved, government-controlled rent and transferability of the right to future controlled rent, incumbent owners will be able to command a premium upon the sale of their housing unit. 802 F.Supp. at 339. The district court holds that summary judgment is appropriate because this possibility of a premium prevented Hawaii's rent control ordinance from substantially advancing its purpose. *Id.* We affirm, holding that "[t]he absence of a mechanism that prevents lessees from capturing the net present value of the reduced land rent in the form of a premium, means that the Ordinance will not substantially further its goal of creating affordable owner-occupied housing." *Id.* at 1166; *see also id.* at 1164–65.

In *Chevron I*, in an effort to reduce retail gasoline prices, Hawaii enacts an ordinance capping the rent gasoline companies can charge lessee-dealers of retail service stations. 57 F.Supp.2d 1003, 1004–04 (D.Haw.1998). The reduced rent is intended to protect the continued viability of independent lessee-dealer stations, leading to a less concentrated market and, in turn, lower retail prices. *Id.* at 1010. Chevron, an oil company, alleges that the ordinance effects a regulatory taking because it does not substantially advance Hawaii's interest in lowering retail gasoline prices. Chevron's expert argues that this is the case for the following reasons: (1) the rent cap will actually discourage independent lessee-dealers, increasing concentration and raising retail prices; (2) any benefit to lessee-dealers will not result in lower retail prices because existing lessee-dealers can capture the value of the reduced rent in the form

of a premium on the sale of their lease-holds; and (3) oil companies may increase wholesale prices to make up for the loss in rental income, thereby removing the possibility of a premium capture by lessee-dealers and lower retail prices. Hawaii's expert disputes the analysis of Chevron's expert on all three points.

The district court grants summary judgment for Chevron, holding that, under *Richardson*, the absence of a mechanism to prevent lessee-dealers from capturing a premium automatically prevents the state from substantially furthering its interest in lower retail prices, rendering the ordinance unconstitutional. *Id.* at 1011. On appeal, we vacate the district court's judgment. *Chevron I*, 224 F.3d at 1042. As an initial matter, we state that to carry its burden of proving the rent cap does not substantially advance a legitimate state interest, Chevron has to show, by a preponderance of the evidence, that the rent cap is not reasonably related to Hawaii's objective of lowering retail prices. *Id.* at 1041. This in turn requires a finding that the cap will not in fact lead to lower prices. *Id.* ("The mere possibility that [retail prices will remain the same] does not satisfy Chevron's burden."). Unlike in *Richardson*, we reason, there are disputed issues of fact regarding the gasoline market and the parties's multi-factored relationship. *Id.* at 1040 ("[O]ur conclusion in *Richardson* [that summary judgment was appropriate] was based on the district court's findings that incumbent owners *will* charge a premium and that the price of housing *will* remain the same."). Remand is necessary to have a better understanding of the market for gasoline in general, *e.g.,* the competitiveness of the market for lessee-dealer rights and the elasticity of demand for gasoline. *Id.* at 1040. Remand is also necessary to determine whether under the circumstances a premium will exist at all. We note that the district court wrongly concluded that "the absence of a mechanism that prevents a premium transfer *necessarily* destroys the constitutionally-required connection." *Id.* (emphasis added). In other words, the possibility of a premium does not render an ordinance unconstitutional where other external factors may prevent a premium from existing altogether. This is the case in *Chevron I*. There is no dispute in that case that lessee-dealers will capture a premium, *if available;* both parties concede that all things remaining equal they will. Remand nonetheless is appropriate to establish the likelihood that oil companies will increase their wholesale prices to regain what they lost in rent and thereby eliminate the *existence* of any premium for lessee-dealers. Therefore, *Chevron I* holds that the conflicting expert evidence creates genuine issues of material fact regarding whether the rent cap will in fact lower retail prices. *Id.* at 1042. ("Whether, and to what extent, Chevron will raise its wholesale price of fuel to compensate for lost rent, and whether, and to what extent, incumbent dealers will capture the value of the capped rent in the form of a premium ... remain as unanswered questions.")

2. *The district court wrongly vacated the amended judgment where the Ordinance does not on its face prevent mobile-home owners from capturing a premium and where there is not sufficient evidence of externalities preventing the possibility of a premium altogether*

In vacating the amended judgment the district court concludes that *Chevron I* requires Cashman and Sutsos to produce empirical evidence on the likelihood that the mobilehome park tenants in Cotati will be able to capture a sales premium, as a matter of fact, and that any such premium will interfere with the purposes of the Ordinance.

This conclusion is based on a misunderstanding of a statement in *Chevron I* that *Richardson* is based on "findings that incumbent dealers *will* charge a premium and that the price of housing *will* remain the same." 224 F.3d at 1040 (emphasis in original). The district court apparently reads this to require a plaintiff—even on a premium-based facial challenge—to establish by empirical evidence that incumbent tenants in the area affected will be likely to capture a premium under the particular ordinance challenged. *Cf. Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 216 F.3d 764, 774 (9th Cir. 2000). However, the district court in *Richardson* does not require, nor is it faced with, such evidence. To the contrary, as noted above, *Richardson* relies only on the economic "principles of premiums" and finds that the rent control ordinance, in conjunction with dual ownership and transferability of ownership, will *"allow"* and *"enable* [ ] an owner-occupant to charge a premium." 802 F.Supp. at 339 (emphasis added). Under the circumstances, more definite proof is not required. *Cf. Chevron I*, 224 F.3d at 1040 (remand appropriate to determine likelihood that oil companies will adjust pricing to offset benefits of rent control law and prevent the existence of premium for dealers).

■ In this case, the district court erred in requiring Cashman and Sutsos to submit the type of empirical evidence discussed above to meet their burden on summary judgment. Like in *Richardson*, there is no dispute that Ordinance No. 680 does not on its face prevent mobilehome tenants from capturing a premium. There is separate ownership of the mobilehome coaches and the underlying land, controlled rent, and the ability of incumbent tenants to sell their mobilehomes subject to this controlled rent. This creates the possibility of a premium, which undermines the City's interest in creating or maintaining affordable housing. *Richardson*, 124 F.3d at 1166. Accordingly, Cashman and Sutsos are entitled to summary judgment on their facial claim unless the City presents sufficient evidence of external factors that will prevent the existence of a premium altogether.

■ The only evidence the City submitted is a 1990 report prepared for the City by an expert who stated that mobilehome owners in Sonoma County (which includes Cotati) are so distrustful of rent control that they will pay *less* for a mobilehome than for one that is not under rent control. The original district court opinion correctly finds that such evidence is insufficient to create a genuine issue of material fact on a facial takings claim under *Richardson* and *Chevron I*. On a facial takings claim, a court is to look only to the ordinance's general scope and dominant features, not its application in specific circumstances. *Tahoe–Sierra Pres. Council, Inc.*, 216 F.3d at 774. Unlike the disputes in *Chevron I*, which are over the operation of the gasoline market generally and whether oil companies will prevent a premium from existing altogether, the mistrust of some would-be mobilehome purchasers in Sonoma County does not pertain to the "dominant" impact of the Ordinance.

We conclude that the district court's order vacating the amended judgment is based on an erroneous interpretation of *Chevron I*. Ordinance No. 680 does not prevent incumbent tenants from capturing a premium. The Ordinance does not substantially further the City's interests, including that of maintaining affordable housing. We remand to the district court to reinstate the original judgment.

**REVERSED AND REMANDED.**

WILLIAM A. FLETCHER, Circuit Judge, dissenting:

In this case we return, unhappily, to rent control. I respectfully but emphatically dissent.

We took a wrong turn in *Richardson v. City and County of Honolulu,* 124 F.3d 1150, 1164 (9th Cir.1997), where we held that when a tenant *actually* captures a premium resulting from a rent control statute, the statute is an unconstitutional regulatory taking unless it "substantially furthers a legitimate state interest." We continued on the wrong path in *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030 (9th Cir.2000) (*Chevron I* ), where we concluded that when a tenant may *possibly* capture a premium, the "substantially furthers" test must be satisfied and remanded for trial. *Id.* at 1040, 1042 (now stating the test as whether the statute "substantially *advances* a legitimate state interest") (emphasis added). We persisted on that wrong path in *Chevron USA, Inc. v. Lingle,* 363 F.3d 846 (9th Cir.2003) (*Chevron II* ), where we affirmed the judgment of the district court, concluding that its factual finding that the rent control statute did not satisfy the "substantially advances" test was not clearly erroneous. 363 F.3d at 857. We now desert the wrong path taken in *Richardson, Chevron I*, and *Chevron II*, only to take yet another wrong path.

I disagreed with the panel in both *Chevron* cases. *See Chevron I*, 224 F.3d at 1042 (W. Fletcher, J., concurring in the judgment); *Chevron II*, 363 F.3d at 858 (W. Fletcher, J., dissenting). But if the majority in today's case were faithful to those cases, I would concur because they are (or were) the law of the circuit.

However, the majority today refuses to apply the *Chevron* cases. Under those cases, the possibility of a premium capture triggered the application of the "substan-tially advances" test. But under today's holding, what was the trigger for the "substantially advances" test has itself become the test. Under today's holding, if there is a possibility that tenants will capture a premium, or even part of a premium, that possibility in and of itself renders a rent control ordinance unconstitutional.

## I. Procedural Background

The City of Cotati, located in Sonoma County, California, north of San Francisco Bay, has controlled rents in mobile home parks since 1979. In 1998, Cotati adopted Ordinance 680, amending the previous rent control ordinance but continuing the same general scheme. Plaintiffs–Appellants Cashman and Sutsos ("plaintiffs") own mobile home parks in Cotati. In 1999, they brought a facial challenge to Ordinance 680, contending that it effects a regulatory taking in violation of the Due Process Clause of the Fourteenth Amendment.

In 2000, based on its reading of *Richardson,* the district court granted summary judgment to plaintiffs. It held that in the absence of a mechanism in Ordinance 680 preventing mobile home park tenants from capturing a premium, the entire ordinance effected an unconstitutional taking. The district court subsequently amended its judgment under Federal Rule of Civil Procedure 59(c), holding unconstitutional only the vacancy control portion of Ordinance 680. After the entry of the district court's amended judgment, we decided *Chevron I,* in which we remanded to the district court for a determination at trial whether a rent control statute "substantially advance[d] a legitimate state interest." *Chevron I,* 224 F.3d at 1040, 1042.

After *Chevron I* was handed down, the district court vacated its summary judgment in this case. Doing as we had in-

structed the district court to do in *Chevron I*, the district court held a trial to determine whether Ordinance 680 satisfies the "substantially advances" test. After a five-day trial, during which evidence was presented by experts from both sides, the district court held against the plaintiffs.

First, the district court held that plaintiffs' claims were barred by the statute of limitations because the 1979 ordinance was applied in the same manner as the later-enacted Ordinance 680. Thus, the one-year statute of limitations had begun to run in 1979. Second, the court held that if the statute of limitations had not run, plaintiffs' claims failed on the merits. It held that plaintiffs had not shown by a preponderance of the evidence that Ordinance 680 is likely to create a premium. It held, further, that even if a premium did exist, plaintiffs had not shown by a preponderance of the evidence that such a premium would prevent the ordinance from substantially advancing such legitimate state purposes as protecting tenants, including elderly and low-income people, from excessive rent increases.

On appeal, the majority first holds that the statute of limitations did not begin to run until the passage of Ordinance 680 in 1998. Although it is a close question, I do not quarrel with the majority on this point.

The majority next holds that the district court erred in amending and then vacating its summary judgment. The majority concludes that there is "the possibility of a premium" under Ordinance 680. Maj. op. at 899. In the sense used here, a "premium" is capitalized value conferred on a tenant by virtue of rent control. If rent control lowers the price of a tenancy below the open-market price for a comparable tenancy, and if an existing tenant can sublease or otherwise sell a rent-controlled tenancy, the existing tenant may be able to obtain, as part of the selling price for that tenancy, the capitalized value of the difference between the rent-controlled rent and the open-market rent. This phenomenon is known as "capturing the premium." Depending on the circumstances and the nature of the particular rent control regime, a tenant may be able to capture some, or even all, of the premium resulting from rent control.

When the majority writes that there is "the possibility of *a* premium," its use of the indefinite article "a" is important. "*The* premium" would mean the entire premium resulting from rent control. By contrast, "*a* premium," as used by the majority, means *any part of* the premium. The majority holds that because of the possibility that mobile home owners might capture "a premium"—that is, part of the premium resulting from Ordinance 680—plaintiffs "are entitled to summary judgment on their facial claim unless the City presents sufficient evidence of external factors that will prevent the existence of a premium altogether." *Id.* at 899. In other words, the majority requires that, in order to sustain the constitutionality of Ordinance 680, defendant Cotati must prove that mobile home owners would not capture any part of a premium as a result of the ordinance. The majority concludes that there is no genuine issue of material fact as to whether mobile home owners would capture any part of such a premium, and therefore reinstates the district court's pre-*Chevron I* summary judgment that Ordinance 680 is unconstitutional.

## II. Rent Control in Mobile Home Parks

Residential rentals in mobile home parks are different from ordinary residential rentals. In an ordinary residential rental, the landlord owns the apartment or house, and rents that apartment or house to the tenant. The tenant brings to the house or apartment only his or her own

personal effects and, at the end of the tenancy, takes away those personal effects. If a landlord raises the rent on the apartment or house and the tenant moves out to avoid the higher rent, the tenant incurs only the expense of moving those effects to a different apartment or house.

By contrast, in a typical mobile home park rental, the landlord is the "park" owner. The park owner owns only the land, or "pad," on which the mobile home sits. The tenant rents the pad but owns the mobile home. Despite their name, mobile homes are not, in fact, mobile. They are constructed off site, put on wheels to be transported, and towed to the site where they will be placed. The difficulty and very substantial expense of moving a mobile home once it has been placed on its pad means that it is almost never moved thereafter.

A mobile home owner—that is, a tenant in a mobile home park—is therefore in a very different economic situation from an ordinary residential tenant. Because of the almost prohibitive expense involved in moving a mobile home, a mobile home park owner has considerable freedom, absent rent control, to raise rents on all of his or her existing tenants. To state it in economic terms, if the park owner raises the rent on an existing tenant who wants to continue living in the mobile home, the tenant is likely to pay any rent increase whose capitalized cost is less than the cost of moving the mobile home. Or, if the park owner raises the rent when an existing tenant sells the mobile home to a new owner, the price paid for the mobile home will likely be reduced by the amount of the capitalized value of the rent increase. To state it in colloquial terms, absent rent control, a park owner can gouge existing tenants.

As a result, many jurisdictions in California and elsewhere have adopted rent control ordinances specifically tailored to mobile home parks. Approximately 100 jurisdictions in California have ordinances of this kind. Most such ordinances are like the ordinances Cotati has had since 1979. Cotati has consistently limited rent increases for existing tenants, and, with some exceptions, limited rent increases for purchasers who buy from existing tenants. Ordinance 680, adopted by Cotati in 1998, limits rent increases in frequency to once a year and in amount to the lesser of 6 percent or the change in the Consumer Price Index. Ord. § 19.14.004(a). Under the "vacancy control" provision of the ordinance, when an existing tenant sells his mobile home to a new tenant, the park owner is not permitted to raise the rent. Ord. § 19.14.150(a). However, if a resident is evicted or voluntarily removes his home from the park, the landowner may establish a new base rent for the next tenant. *Id.*

### III. The Majority Errs in Reinstating Plaintiffs' Summary Judgment

Assuming that our earlier decisions in *Richardson, Chevron I,* and *Chevron II* are correct, the majority errs in reinstating the district court's summary judgment that Ordinance 680 is an unconstitutional regulatory taking. In reinstating that judgment, the majority writes:

> The only evidence the City submitted [at summary judgment] is a 1990 report prepared for the City by an expert who stated that mobilehome owners in Sonoma County (which includes Cotati) are so distrustful of rent control that they will pay less for a mobilehome than for one that is not under rent control. The original district court opinion correctly finds that such evidence is insufficient to create a genuine issue of material fact on a facial takings claim under *Richardson* and *Chevron I*. On a facial takings

claim, a court is to look only to the ordinance's general scope and dominant features, not its application in specific circumstances.... [T]he mistrust of some would-be mobilehome purchasers in Sonoma County does not pertain to the "dominant" impact of the Ordinance. *Id.* at 899. The majority makes several mistakes.

First, the majority misdescribes the nature of a facial challenge. A successful constitutional facial challenge to an ordinance requires that a plaintiff show that the ordinance is incapable of constitutional application under any circumstances. *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *Cogswell v. City of Seattle,* 347 F.3d 809, 814 (9th Cir.2003). The plaintiff has the burden of proof of unconstitutionality. *Id.* at 813. Instead of following this established law, the majority concludes that "the possibility" of capture of any part of the premium means that the defendant rather than the plaintiff has the burden of proof of the ordinance's constitutionality. According to the majority, the defendant's burden is to show that there are "external factors that will prevent the existence of a premium altogether."

Second, the majority misapplies *Chevron I.* In *Chevron I,* there was a possibility of premium capture by the tenants. We did not, because of that possibility, require the defendant to show external factors that would altogether have prevented the existence of a premium. Nor did we hold that in the absence of such a showing by the defendant the plaintiff was entitled to summary judgment. Rather, we remanded to the district court for trial to determine if the statute "substantially advanced a legitimate state interest." We wrote that "[b]ecause resolution of these factual issues[about the existence of a premium and benefits to tenants] is necessary to determine whether Act 257 substantially advances, or bears a reasonable relationship to, the State's interest in lowering gasoline prices, the district court erred in granting summary judgment." 224 F.3d at 1042. Based on *Chevron I,* the district court in this case was entirely correct to vacate its summary judgment and to hold a trial to resolve the factual issues of whether a premium was created by Ordinance 680, and whether that ordinance substantially advances a legitimate state purpose.

Third, the majority mischaracterizes the evidence before the district court on summary judgment. It states that defendant Cotati put only one "report" into evidence and that this report did not create a genuine issue of material fact. The majority is referring to an extensive 1990 empirical study conducted by Dr. Stephen Lewis, entitled "Economic Impact of Rent Controls on Mobile Home Resale Prices in Sonoma County and Cotati." Dr. Lewis, who later testified at trial for Cotati, concluded that there was no premium as a result of mobile home rent control in Cotati. Indeed, according to Dr. Lewis's study, mobile homes subject to rent control in Cotati sold at a substantial discount rather than a premium. Dr. Lewis summarized the results of his study as follows:

> When mobile home pad rents are subject to rent controls and when these rents are below the market value, economic theory suggests that pad rent differentials will be capitalized into the resale prices of mobile homes subject to rent controls. The data examined in this study leads to the conclusion that rent controls in Sonoma County and more specifically in Cotati and Rohnert Park have not had the expected impact on mobile home resale prices. Using data from several sources and standard statistical techniques, it has been determined after controlling for other factors

that mobile home parks subject to rent control have sold on average for *less* than those not subject to controls....

Mobile homes subject to rent controls are less desirable than uncontrolled ones because of uncertainties and risks associated with rent control programs....

*[I]t is clear that in Sonoma County mobile homes subject to rent controls do not sell at a premium but rather at a substantial discount. Claims that such premiums exist are unwarranted and without merit.*

(Emphasis added.)

Finally, the majority misstates the record in saying that the only evidence presented by Cotati at summary judgment was Dr. Lewis's study. Cotati presented in addition a study by Dr. Kenneth Baar, who also later testified at trial for Cotati. Dr. Baar studied the effect of vacancy controls in mobile home park rentals in a different community in California. Vacancy controls limit the ability of the park owner to increase pad rent when a mobile home owner sells the mobile home. Such controls have been a feature of Cotati mobile home rent control both before and after the adoption of Ordinance 680. Dr. Baar concluded that a vacancy control feature of a rent control ordinance did not create a premium—that is, it does not produce a higher resale price for mobile home owners. Dr. Baar wrote:

From a purely theoretical perspective, the reduced rents resulting from vacancy control might be precisely offset by the increase in value of the mobilehome in the vacancy controlled space. In fact, however, the markets for the mobilehome space and the mobilehome operate in substantially different fashions, so that effects of vacancy control do not follow the foregoing theoretical model.

\* \* \*

From an affordable housing point of view, it appears that in [this community], even with vacancy control, the initial costs of mobilehome ownership for prospective purchasers ... will be *lower* than these costs in the absence of vacancy control.

(Emphasis added.)

If the majority had properly allocated the burden of proof in plaintiffs' facial attack on Ordinance 680, if it had properly followed *Chevron I,* and if it had properly characterized the evidence put in the record by Cotati at summary judgment, it would have concluded that the district court correctly vacated the summary judgment and sent this case to trial. At summary judgment, Dr. Lewis and Dr. Baar presented competent evidence that, if believed, compelled a conclusion that no premium was, or would be, created by mobile home park rent control in Cotati. Because Cotati produced sufficient evidence to create a genuine issue of material fact, the district court was required under *Chevron I* to deny summary judgment and proceed to trial.

## IV. Defendant's Judgment after Trial Should be Affirmed

In reinstating the district court's summary judgment, the panel majority implicitly concludes that the evidence at trial was not enough to justify a judgment sustaining the constitutionality of Ordinance 680. I say this because, although Cotati presented more evidence at trial than at summary judgment, that evidence was to the same effect as the Lewis and Baar studies already presented by Cotati at summary judgment. If the majority is willing to disregard the evidence of the Lewis and Baar studies, it would be equally willing to disregard the additional evidence. This additional evidence consists of four empirical studies conducted by James

Brabant, a professional real estate appraiser, of actual mobile home sales in Sonoma County and adjoining Napa County. Mr. Brabant concluded from these studies that no premium was created by Ordinance 680.

Plaintiffs presented evidence at trial through Dr. Werner Hirsch, Dr. Robert Edelstein, and John Patrick Neet. However, the district court found as a matter of fact that plaintiffs' experts' studies and testimony were less believable than those of Dr. Lewis, Dr. Baar, and Mr. Brabant.

I disagree with the majority's implicit conclusion that the evidence presented by Cotati was insufficient to support the district court's judgment. I would uphold the factfinding of the district court after trial under the clearly erroneous standard, as we upheld the factfinding of the district court after trial in *Chevron II*, 363 F.3d at 857, and I would affirm the judgment of the district court.

## V. A Return to Judicial Activism

We learned in the 1930s that economic regulation is generally done better by politically accountable legislators than by life-tenured judges. I regret to say that the Ninth Circuit is unlearning that painfully learned lesson.

There are two different constitutional tests that could conceivably apply to a rent control ordinance. The first is the "reasonableness" test ordinarily applied to rent and price control statutes. *See, e.g., Pennell v. City of San Jose*, 485 U.S. 1, 11, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) (upholding a rent control ordinance because it was not "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt") (quoting *Permian Basin Area Rate Cases*, 390 U.S. 747, 769–70, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)). The second is the "substantially advances a legitimate state interest" test ordinarily applied to zoning and other land use regulations. *See, e.g., Agins v. City of Tiburon*, 447 U.S. 255, 261, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (upholding a zoning ordinance because it "substantially advance[d] legitimate governmental goals"); *Dolan v. City of Tigard*, 512 U.S. 374, 385, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987).

In *Richardson*, decided in 1997, we applied the "substantially advances" test to invalidate a rent control ordinance under which we concluded that the tenant was actually able to capture the premium resulting from rent control. *See* 124 F.3d at 1166 ("Incumbent owner occupants who sell to those who intend to occupy the apartment *will charge a premium* for the benefit of living in a rent controlled condominium. The price of housing ultimately *will remain the same.*") (emphasis added). In *Chevron I*, three years later, we went beyond *Richardson*, holding that the "substantially advances" test must be applied to the rent control statute at issue because of the "possibility" of premium capture. *See* 224 F.3d at 1035 (applying the "substantially advances" test because of the "stipulated possibility that [a tenant] will be able to capture the value of the decreased rent in the form of a premium."). In *Chevron II*, just last year, we upheld as not clearly erroneous the factfinding of the district court that the "substantially advances" test had not been satisfied, and that the rent control statute was unconstitutional. *See* 363 F.3d at 857 ("Based on all the evidence adduced at trial, the district court concluded that [the rent control statute] will not substantially advance a reduction in the retail price of gasoline. The court's factual findings and conclusions of law are consistent with the views of the parties' experts and are not clearly erroneous."). Finally, today the majority holds that the mere "possibility" that a tenant could capture part of the premium

from a rent control ordinance is enough to render the ordinance unconstitutional. It then reinstates a summary judgment of unconstitutionality despite evidence in the record that no premium actually resulted, or would result, from Ordinance 680.

The only possible basis for the majority's holding is dictum in *Yee v. City of Escondido,* 503 U.S. 519, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), in which the Supreme Court *upheld* a mobile home rent control ordinance against a takings challenge. The Court upheld the ordinance against a physical takings challenge, but refused to consider whether the ordinance constituted a regulatory taking. In the course of noting that it was not considering the regulatory takings issue, the Court wrote in dictum:

> [T]he effect of the rent control ordinance, coupled with the restrictions on the park owner's freedom to reject new tenants, is to increase significantly the value of the mobile home. This increased value normally benefits only the tenant in possession at the time the rent control is imposed.... Petitioners are correct in citing the existence of this premium as a difference between the alleged effect of the Escondido ordinance and that of an ordinary apartment rent control statute.... [P]etitioners contend that the Escondido ordinance transfers wealth only to the incumbent mobile home owner. This effect might have some bearing on whether the ordinance causes a *regulatory* taking, as it may shed some light on whether there is a sufficient nexus between the effect of the ordinance and the objectives it is supposed to advance. *See Nollan v. California Coastal Comm'n,* [483 U.S. 825, 834–35 (1987)]. But it has nothing to do with whether the ordinance causes a *physical* taking.

*Id.* at 530, 112 S.Ct. 1522 (emphasis in original).

It is a very long way from this passage in *Yee* to the majority's holding in this case. The Court in *Yee* did not say, even in a case where there was an actual premium, that the *Nollan* "substantially advances" test would apply. Nor did the Court in *Yee* say that where there was only the possibility of a premium, the "substantially advances" test would apply. Nor, finally, did the Court in *Yee* say that the possibility of a premium alone would render a rent control ordinance unconstitutional, without regard to the "substantially advances" test.

Based on a slender hint in *Yee,* we have constructed a new doctrine out of whole cloth. This interpretation is the Ninth Circuit's alone; I have found no case outside our circuit that reads *Yee* as the majority reads it. After today's decision, the possibility of capture of any part of a premium by a tenant renders a rent control ordinance unconstitutional. Even if two qualified experts present evidence that there is, in actual fact, no premium, a plaintiff is entitled to summary judgment that the ordinance is unconstitutional. With all due respect to my colleagues, this simply cannot be the law.